UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Civil Action No. 24-cv-417

KSENIA MARKEL,

    Plaintiff,

v.

SANDSTONE CARE LLC;
SANDSTONE CARE COLORADO, LLC;
SANDSTONE CARE COS LLC; and
SANDSTONE CARE HOLDINGS LLC,

    Defendants.

## COMPLAINT

Plaintiff, KSENIA MARKEL, by and through her undersigned counsel, EISENBERG & BAUM, LLP and FOX & ROBERTSON, PC, hereby states her Complaint against Defendants, SANDSTONE CARE LLC; SANDSTONE CARE COLORADO, LLC; SANDSTONE CARE COS LLC; and SANDSTONE CARE HOLDINGS LLC as follows:

### PRELIMINARY STATEMENT

1. Plaintiff Ksenia Markel, ("Ksenia") a Deaf woman whose primary language is American Sign Language, sought treatment for alcohol and drug addiction from Defendants' Sandstone Care (collectively herein "Sandstone") in March 2023.

2. Defendants are the owners and operators of dozens of drug and alcohol rehabilitation residences within this judicial district and across the country.

3. Defendants discriminated against Ksenia by refusing to provide effective auxiliary

aids and services for Ksenia to allow her to have equal access and participation to fully participate in the services that Sandstone had to offer, despite repeated requests for sign language interpreters to ensure equal access to Defendant's services.

4. American Sign Language ("ASL") is a visual, three-dimensional, non-linear language, and its grammar and syntax differ from the grammar and syntax of English and other spoken languages. ASL is best thought of as its own language used by American Deaf people, with its own grammar and syntax.

5. Accordingly, in a drug and alcohol rehabilitation facility, writing is not an effective means of communicating with deaf persons regarding complex communications such as assessment, planning, intake, screening, medical care, recreation, therapy, meetings, psychological services, emergencies, discharge instructions, and various legal and quasi-legal situations.

6. Lip-reading, the ability to understand the speech of another by watching the speaker's lips, is an extremely speculative means of communication and is no substitute for communication through a qualified sign language interpreter. Only a small amount of the spoken sounds of aural language are visible, and many of those appear identical on the lips. Even the most adept lip-readers, in an ideal one-to-one situation, have been found to understand only 26% of what is said.

7. For these reasons, ASL interpreters are necessary accommodations for Deaf individuals like Ksenia receiving treatment in drug and alcohol rehabilitation facilities when that care involves complicated information, group communications, lengthy communications, or when the individual has other conditions that make treatment or communicating through other means more difficult.

8. In the context of residential drug and alcohol rehabilitation services, the outright refusal to provide an ASL interpreter at any point in participation, care, and/or treatment will result in ineffective communication for Deaf residents like Ksenia.

9. Despite being informed of Ksenia's requirement for sign language interpreters for effective communication and equal access, Sandstone did not commit to provide sufficient interpreter services at its own cost throughout Ksenia's stay.

10. By refusing to supply qualified ASL interpreters or other necessary auxiliary aids and services at their expense for most of her stay, ensuring effective communication for equal participation and access to its services, the Defendants discriminated against Ksenia.

11. Sandstone insisted that Ksenia's family provide and pay for interpreters for at least part of each day, shifting the responsibility for providing necessary accommodations onto the family.

12. It is unlawful to make a prospective Deaf resident like Ksenia bear the cost of a necessary service like a sign language interpreter for Ksenia's care at Sandstone.

13. After Ksenia, through her family and attorney, informed Sandstone of its legal obligations to provide effective communication throughout the program, Sandstone later stated that Ksenia would no longer be accepted into its program.

14. Providing accommodations such as sign language interpreters to Ksenia would not constitute an undue burden on Sandstone as the proper evaluation of such is not the cost of accommodation to the payment for services but the overall financial resources of the entity.

15. It has been publicly reported that Sandstone has received hundreds of millions of dollars of investments by private equity firms in the past three years.

3

https://healthcareservicesinvestmentnews.com/2022/07/22/vistria-invests-upwards-of-200m-in-sandstone-care/.

16. In addition, after Ksenia asserted her rights under relevant laws against discrimination, Defendants retaliated against Ksenia by claiming, pretextually, that she was not qualified to enter the facility, when in fact she was.

17. Plaintiff brings this lawsuit to compel Defendants to cease their unlawful discriminatory practices and to implement policies and procedures that will ensure effective communication, full and equal enjoyment, and a meaningful opportunity to participate in and benefit from Defendants' residential and health care services. Plaintiff seeks declaratory, injunctive, and equitable relief; compensatory and punitive damages; and attorneys' fees and costs to redress Defendants' unlawful disability discrimination in violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*; Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.*,; and the Colorado Anti-Discrimination Act ("CADA")  Colo. Rev. Stat. §§ 24-34-601, 24-34-802.

## PARTIES

18. Plaintiff, Ksenia Markel is currently a resident of San Diego, California who is substantially limited in the major life activities of hearing and speaking. Thus, she has a "disability" within the meaning state, and federal civil rights laws.

19. Upon information and belief, defendant SANDSTONE CARE LLC is the owner, lessor, and/or operator of a residential drug and alcohol rehabilitation facility, and has at all relevant times been a domestic limited liability company maintaining its principal place of business and registered address for service at 7555 E Hampden Ave Ste 103, Denver, CO 80231.

20. Upon information and belief, defendant SANDSTONE CARE COLORADO, LLC is the owner, lessor, and/or operator of a residential drug and alcohol rehabilitation facility, and has at all relevant times been a domestic limited liability company maintaining its principal place of business and registered address for service at 7555 E Hampden Ave Ste 103, Denver, CO 80231.

21. Upon information and belief, defendant SANDSTONE CARE COS LLC is the owner, lessor, and/or operator of a residential drug and alcohol rehabilitation facility, and has at all relevant times been a domestic limited liability company maintaining its principal place of business and registered address for service at 7555 E Hampden Ave Ste 103, Denver, CO 8023.

22. Upon information and belief, defendant SANDSTONE CARE HOLDINGS LLC is the owner, lessor, and/or operator of a residential drug and alcohol rehabilitation facility, and has at all relevant times been a domestic limited liability company maintaining its principal place of business and registered address for service at 7555 E Hampden Ave Ste 103, Denver, CO 8023.

## JURISDICTION AND VENUE

23. This Court has subject matter jurisdiction for Plaintiff's federal law claims under 28 U.S.C. §§ 1331 and 1343 because this action arises under the laws of the United States. This Court also has supplemental jurisdiction for Plaintiff's state law claims under 28 U.S.C. § 1367 because those claims are substantially related to the federal-law claims.

24. Venue is proper in this District under 28 U.S.C. § 1391(b) because, among other things, Defendants reside in this District and the acts and omissions giving rise to this Complaint occurred in this District.

## STATEMENT OF FACTS

25. Ksenia Markel is a 24-year-old Deaf woman whose primary language is American

Sign Language.

26. In March 2023, Ksenia's alcohol and marijuana use escalated, prompting her and her parents to seek treatment for alcohol and drug addiction from Sandstone in March 2023.

27. Diana Markel, Ksenia's mother, initially contacted Sandstone on or about March 23, 2023, to inquire about detox and inpatient treatment for Ksenia.

28. Sandstone directed Ksenia to its Colorado facility, citing her gender as the reason for the location preference.

29. From the outset, Sandstone was aware that Ksenia was Deaf and would need sign language interpreter services to fully participate in Sandstone's services.

30. On or about March 27, 2023, Sandstone interviewed Ksenia over the phone using a sign language interpreter provided by Ksenia, as Sandstone refused to communicate with her over video-conferencing.

31. Ksenia was clinically approved for treatment at Sandstone Care on March 28, 2023.

32. Following the approval, Ava Rogers, Sandstone's Admissions Coordinator, informed Ksenia's mother that Ksenia would need an interpreter at all hours of the night to come to the facility, and it was the family's responsibility and not Sandstone's to pay for the cost.

33. On March 29, 2023, Diana Markel expressed concern about Ksenia's condition and her immediate need for treatment.

34. The same day, Ms. Rogers left a voicemail confirming a bed for Ksenia but conditioned her admission on arranging interpreters, violating her right to ADA accommodations.

35. On March 31, 2023, Sandstone stated that 24/7 interpretation services were necessary and would be the family's financial responsibility.

36. On or about March 31, 2023, Sandstone communicated a delay in admitting Ksenia due to unresolved interpreter arrangements.

37. Between March 23, 2023, and April 4, 2023, Ksenia's family searched extensively for sign language interpretation resources to inform Sandstone of such services' availability and succeeded in doing so.

38. On April 3, 2023, Diana Markel expressed gratitude for Ksenia's acceptance into the program but raised concerns over the lack of updates and the urgent need for treatment.

39. On April 4, 2023, Ms. Rogers reiterated the need for the family to provide overnight interpreter support at the family's cost, escalating the discriminatory conditions.

40. On April 5, 2023, Heath Bechler, Sandstone's Director of Admissions, confirmed that the family must pay for overnight interpreters directly in contravention of ADA requirements.

41. Diana Markel urgently responded that the family was willing to provide ASL interpreters, despite the law requiring Sandstone to provide effective communication and auxiliary aids and services and prohibiting it from requiring the family to pay, to expedite Ksenia's admission, demonstrating the family's desperation.

42. Ms. Rogers emailed Diana Markel on April 5, 2023, stating that Ksenia would take the next female bed, confirming that Ksenia had satisfied Sandstone's admissions criteria but falsely implying a resolution to her communications issues.

43. Mr. Bechler confirmed Ksenia's placement on the bed board for the next available bed, again confirming that Ksenia had satisfied Sandstone's admissions criteria but misleading the family about her imminent admission.

44. On April 6, 2023, Sandstone insisted that ASL interpreters must be physically

7

present on-site and paid for by the Markels, increasing the financial burden on the Markels.

45. Diana Markel arranged for local qualified interpreters on April 7, 2023, to meet Sandstone's demands.

46. Sandstone sent the Markels a Program Deposit document on April 7, 2023, outlining charges without addressing the interpreter issue. Diana Markel signed the document via DocuSign as set up by Sandstone.

47. In an email on April 8, 2023, Sarah Fletcher, Sandstone's Chief Clinical Officer, detailed additional conditions for interpreter services, demanding family-provided interpreters for off-hours clinical engagement and emergencies, further deviating from Defendants' legal obligations.

48. Despite the fact that effective communication was Sandstone's legal obligation, the Markels prepared to provide ASL interpreters to facilitate Ksenia's admission due to the urgency of her condition and their desire to help her.

49. On April 12, 2023, the Markels' attorney reached out to Ms. Fletcher, attempting to rectify the legal misunderstandings and ensure Ksenia's treatment.

50. During the delay in Ksenia's admission – which was due to Ksenia's request for interpreter services – her condition worsened, culminating in an incident of self-harm between April 12 and 13, 2023.

51. Sandstone, on April 21, 2023, excluded Ksenia from the program, citing self-harm as disqualification based on its admissions criteria, despite it being a result of their discriminatory actions and despite evidence that Sandstone's treatment extended to those who engaged in self-harm.

52. Ksenia through her attorney requested Sandstone's admission criteria on April 24, 2023, to understand the basis of Ksenia's exclusion.

53. After a ten-day delay, Sandstone's counsel failed to provide the admission criteria, further obscuring their discriminatory practices.

54. A renewed request for the criteria was made, with Sandstone stating that it would not be provided to clients or families, suggesting a lack of transparency.

55. As such, an "attorneys' eyes only" confidentiality agreement was proposed to protect the sensitive information.

56. On May 15, 2023, Sandstone's counsel rejected the proposed confidentiality agreement, and continued to unjustifiably withhold the admission criteria.

57. This rejection was purportedly rationalized with concern for Ksenia's well-being, underscoring the pretextual nature of Sandstone's discrimination.

58. To date, Sandstone has never provided the Markels or their attorneys with a copy of the admissions criteria on which it ostensibly relied to categorically exclude Ksenia from its programs.

59. Sandstone's position of not treating anyone requiring an interpreter unless the family bears most of the cost demonstrates a significant barrier to access for disabled individuals, contrary to anti-discrimination laws.

60. The distress caused by Sandstone's actions led to Ksenia's self-harm, establishing grounds for her damages claim.

61. The facial discrimination evidenced in Sandstone's written and oral statements to the Markels as well as its categorical exclusion of Ksenia based on admission criteria it refused to

9

share show a clear intent to discriminate against Ksenia based on her disability.

62. Requests by the Markels' counsel for Sandstone's admissions criteria were not fulfilled, indicating a lack of transparency.

63. Sandstone's demands for the Markels to provide sign language interpreters at their cost violated federal laws requiring the provision of effective communication by the treatment facility and prohibiting the facility from requiring the Markels to pay.

64. The delays and additional demands placed on Ksenia and her family by Sandstone exacerbated Ksenia's condition, leading to a critical incident of self-harm.

65. Sandstone's actions demonstrate a failure to accommodate a patient with disabilities as required by law, constituting discriminatory treatment in violation of the FHA, ADA, and CADA.

66. The refusal to provide necessary accommodations and subsequent exclusion of Ksenia from the program constitutes a violation of the FHA, ADA, and CADA.

67. Due to Sandstone's unlawful demands, the Markels were compelled to undertake burdens and expenses beyond their legal responsibility.

68. Sandstone's conduct has caused significant emotional distress and harm to Ksenia and her family, requiring legal action to address the violations of her rights.

69. Ksenia intends to go to Sandstone in the future, predicated on the assumption that necessary changes are made to accommodate her communication needs as a deaf individual. This includes providing effective communication methods, such as American Sign Language interpreters, at Sandstone's own cost to ensure equal access to and enjoyment of the services provided by the facility.

70. Ksenia is currently deterred from going to Sandstone until its discriminatory practices cease.

## CAUSES OF ACTION

## CLAIM I: VIOLATIONS OF THE FAIR HOUSING ACT

71. Plaintiff incorporates by reference all preceding paragraphs and realleges them in support of this claim.

72. This action is brought to enforce the requirements of the FHA, 42 U.S.C. § 3604, *et seq*.

73. Defendants' violations of the FHA include but are not limited to those detailed below.

74. Defendants own and/or lease dwellings within the meaning of 42 U.S.C. § 3602(b), which includes "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

75. The FHA applies to all dwellings "*except as exempted by sections 803(b) [§ 3603(b)] and 807 [§ 3607] of this title*." 42 U.S.C. § 3604 (emphasis added); *see also* 42 U.S.C. § 3603(a) (stating that upon enactment, the FHA's prohibition of discrimination in the sale or rental of dwellings would immediately cover four types of dwellings, and after December 31, 1968, such coverage would extend to "all other dwellings except as exempted by [Section 3603(b)]").

76. The FHA provides that it is illegal "to discriminate against any person in the terms, conditions, privileges of sale or rental of a dwelling or in the provision of services or facilities in connection with such dwelling," because of disability. 42 U.S.C. § 3604(f)(2).

77. Under the FHA, discrimination includes "a refusal to make reasonable

11

accommodations in rules, polices, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

78.   Plaintiff requested and was denied the reasonable accommodation of having qualified ASL interpreters provided at Sandstones cost, which would have allowed Plaintiff access and an opportunity to participate, use and enjoy services provided by Defendants' facilities that are connected to their dwellings and which equally situated hearing residents are able to enjoy.

79.   Additionally, under the FHA, it is "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed . . . any right granted or protected by section . . . 3604 . . . of this title." 42 U.S.C. § 3617

80.   Plaintiff exercised her rights under the FHA when she requested accommodations based on their deafness to ensure equal enjoyment and participation in the facilities.

81.   Defendants retaliated against Plaintiff for exercising her rights when Defendants:

   a. Delayed the admission process for Ksenia when she desperately needed help as soon as possible unless demands that the family pay for interpreter services were met; and

   b. After Ksenia retained counsel to assist her in asserting her right to accommodations and effective communication, Sandstone relied on the pretext of Ksenia's self-harming behavior to categorically refuse to admit her.

12

82. As a direct and proximate result of Defendants' retaliation, Plaintiff suffered damages for the injuries and loss they sustained due to Defendants' discriminatory conduct and deliberate indifference of Plaintiffs' exercise of their rights under FHA.

83. Specifically, as a direct and proximate result of the Defendants' actions, Plaintiff suffered additional emotional distress, engaged in self harm, had to delay much needed treatment, engage in the services of an attorney and suffered irreparable harm.

84. Plaintiff is an aggrieved person within the meaning of 42 U.S.C. § 3602(i), and has suffered emotional distress and other compensatory damages as a result of Defendants' discriminatory conduct.

85. Plaintiff is therefore entitled to nominal damages as a result of Defendants' discriminatory conduct as hereinbefore alleged. 42 U.S.C. § 3604, et. seq.

86. Plaintiff is further entitled to entitled to compensatory damages, punitive damages, and reasonable attorneys' fees and costs pursuant to the FHA. 42 U.S.C. § 3613(c).

### CLAIM II: VIOLATIONS OF TITLE III OF THE AMERICANS WITH DISABILITIES ACT

87. Plaintiff incorporates by reference all preceding paragraphs and realleges them in support of this claim.

88. This action is brought to enforce the requirements of Title III of the ADA, 42 U.S.C. § 12181, *et seq*.

89. Defendants' violations of the ADA include but are not limited to those detailed below.

90. At all times relevant to this action, Title III of the ADA, 42 U.S.C. § 12181, *et seq*. has been in full force and effect and has applied to Defendants' conduct.

91. At all times relevant to this action, Plaintiff has been substantially limited in the major life activities of seeing, hearing and speaking, and is therefore an individual with a disability within the meaning of the ADA, 42 U.S.C. § 12102(2).

92. Defendants own, lease, and/or operate a place of public accommodation within the meaning of the ADA, 42 U.S.C. § 12181(7)(F).

93. Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

94. Title III of the ADA defines discrimination to include denying participation or offering unequal or separate benefit to individuals with disabilities. 42 U.S.C. § 12182(b)(1)(A).

95. Title III of the ADA further defines discrimination to include "a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." 42 U.S.C. § 12182(b)(2)(A)(iii).

96. Federal regulations implementing Title III of the ADA provide that a public "shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c).

97. Federal regulations implementing Title III of the ADA further provide that a public entity "shall take those steps that may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services" 28 C.F.R. § 36.303(a).

98. Plaintiff is a person whose deafness is obvious, readily apparent and known by the Defendants, who have regarded Plaintiff as a deaf person.

99. The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act." 42 U.S.C. § 12203(a).

100. Plaintiff exercised her rights under the ADA when she requested accommodations based on their deafness to ensure equal enjoyment and participation of Defendants' facilities.

101. Defendants retaliated against Plaintiff for exercising her rights when Defendants:

    a. Delayed the admission process for Ksenia when she desperately needed help as soon as possible unless demands that the family pay for interpreter services were met;

    b. After Ksenia retained counsel to assist her in asserting her right to accommodations and effective communication, Sandstone relied on the pretext of Ksenia's self-harming behavior to categorically refuse to admit her.

102. As a direct and proximate result of Defendants' retaliation, Plaintiff suffered damages for the injuries and loss she sustained as a result of Defendants' discriminatory conduct and deliberate indifference of Plaintiff's exercise of their rights under ADA.

103. Specifically, as a direct and proximate result of Defendants' actions, Plaintiff suffered additional emotional distress, engaged in self-harm, had to delay much-needed treatment, engaged in the services of an attorney, and suffered irreparable harm.

15

104. Defendants discriminated against Plaintiff, on the basis of her disability, in violation of the ADA.

105. Defendants discriminated against Ksenia in violation of the ADA by, among other actions, failing to provide effective communication, placing discriminatory conditions on her participation in its programs, and retaliating against her for opposing its discriminatory practices and participating in the investigation of those practices.

106. Plaintiff is therefore entitled to injunctive relief, as well as an award of attorney's fees, costs, and disbursements pursuant to the ADA, 42 U.S.C. § 12188(a)(1) and/or common law.

## CLAIM III: VIOLATION OF THE COLORADO ANTI-DISCRIMINATION ACT

107. Plaintiff incorporates by reference all preceding paragraphs and realleges them in support of this claim.

108. This action is brought to enforce the requirements of the CADA, Colo. Rev. Stat. § 24-34-802.

109. Defendants' violations of the CADA include but are not limited to those detailed below.

110. The Colorado Anti-Discrimination Act ("CADA"),  Colo. Rev. Stat. § 24-34-802, prohibits discrimination on the basis of disability by places of public accommodation.  That section provides:

> An individual with a disability, as defined in section 24-34-301, must not, by reason of the individual's disability, be excluded from participation in or be denied the benefits of services, programs, or activities provided by a place of public accommodation, as defined in section 24-34-601(1), . . . or be subjected to discrimination by any such place of public accommodation . . . .

111. Section 24-34-601(1) defines a place of public accommodation as "any place of business engaged in any sales to the public and any place offering services, facilities, privileges, advantages, or accommodations to the public." The definition specifically includes clinics, hospitals, and establishments serving a person's health.

112. As a Deaf woman, Plaintiff Markel is an individual with a disability within the meaning of the CADA. Colo. Rev. Stat. § 24-34-301(7) (incorporating by reference 42 U.S.C. § 12102 among other provisions).

113. The CADA prohibits retaliation against individuals who oppose discriminatory practices or filed a charge of discrimination. Colo. Rev. Stat. § 24-34-802(1)(a).

114. The CADA is "substantially equivalent to Federal law, as set forth in the Americans with Disabilities Act, as amended . . .." 3 Colo. Code Regs § 708-1:60.1(A).

115. Defendants discriminated against Ksenia in violation of the CADA by, among other actions, failing to provide effective communication, placing discriminatory conditions on her participation in its programs, and retaliating against her for opposing its discriminatory practices and participating in the investigation of those practices.

116. Defendants' discrimination and retaliation are the proximate and legal cause of Plaintiff's injuries.

117. Plaintiff has been and continues to be damaged by Defendants' unlawful conduct under the CADA.

118. Plaintiff is entitled to damages pursuant to Colo. Rev. Stat. § 24-34-802(2)(a).

119. Plaintiff is also entitled to declaratory and injunctive relief as may be allowed to remedy the harm she continues to suffer from Defendants' discrimination and retaliation.

120. Plaintiff is entitled to her attorneys' fees pursuant to Colo. Rev. Stat. § 24-34-802(3).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court after having found a violation of the laws asserted:

**Issue Declaratory Relief:**

Declaring that Defendants' practices of refusing to provide effective auxiliary aids and services, including qualified sign language interpreters, to Deaf individuals and retaliating against those who assert their rights under the FHA, ADA, and CADA are unlawful and violate the rights of Plaintiff and others similarly situated.

**Issue Injunctive Relief:**

A. Permanently enjoin Defendants from engaging in any discriminatory practices against Deaf individuals or any practices that deny equal access to Defendants' services.

B. Order Defendants to adopt and implement comprehensive policies and procedures to ensure full and equal access for Deaf individuals, including but not limited to the provision of qualified sign language interpreters and other effective auxiliary aids and services, at no cost to the individuals.

C. Require Defendants to establish a monitoring and complaint resolution mechanism, overseen by an independent third party, to ensure compliance with these policies and address any future grievances.

D. Mandate Defendants to undergo a program of periodic compliance reviews and audits for a period of no less than five years, conducted by an independent entity with expertise in

ADA compliance, to ensure adherence to the required accommodations and non-discriminatory practices.

E. Compel Defendants to conduct comprehensive training for all employees, staff, and management on the requirements of the FHA, ADA, CADA, and the rights of individuals with disabilities, with a specific focus on Deaf individual's needs the importance of effective communication, and legal obligations to provide accommodations.

**Restorative Relief:**

Order Defendants to take affirmative steps to restore Plaintiff to the position she would have been in but for the discriminatory conduct, including offering admission to the program with the necessary accommodations at no cost and providing additional support to address any exacerbation of her condition caused by the delay and discrimination experienced.

**Award to Plaintiff:**

A. Nominal damages under the FHA and CADA in recognition of the infringement of her rights;

B. Compensatory damages under the FHA and CADA for the emotional distress, physical and financial harm, and any other losses incurred as a direct result of Defendant's discriminatory actions;

C. Punitive damages under the FHA on Defendants to deter future discriminatory practices and to punish Defendants for their egregious conduct;

D. Reasonable costs and attorney's fees incurred in bringing this action;

E. Pre-judgment and post-judgment interest on all monetary awards at the highest rate allowed by law;

F. Grant such other and further relief as the Court may deem just and proper, including but not limited to measures that will facilitate systemic changes within Defendants' operations to prevent future FHA, ADA, and CADA violations.

Dated: February 12, 2024

Respectfully submitted,

**EISENBERG & BAUM, LLP**

/s/ Andrew Rozynski
Andrew Rozynski
24 Union Square East, PH
New York, NY 10003
Tel: (212) 353-8700
Fax: (917) 591-2875
arozynski@eandblaw.com


FOX AND ROBERTSON, PC

/s/ Amy F. Robertson
Amy F. Robertson
1 Broadway, Suite B205
Denver, CO 80203
(303) 951-4164
arob@foxrob.com

*Attorneys for Plaintiff*